UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANILO PENNACCHIA,<br><br>　　　　　Petitioner,<br><br>v.<br><br>DENA MICHELLE HAYES,<br><br>　　　　　Respondent. | Case No. 1:16-CV-00173-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court in this matter is a Verified Petition for Return of Child. The Court held an evidentiary hearing and parties have filed briefing and supporting materials on the Petition. Having considered the entire record, the Court denies the Petition.

## FACTUAL AND PROCEDURAL BACKGROUND

The Petitioner, Danilo Pennacchia, and Respondent, Dena Michelle Hayes, are the unwed parents of the five year old child ("SAPH" or "the Child") who is the subject of this case. The Petitioner is a citizen of Italy and the Respondent is a citizen of the United States. SAPH was born in Seattle, Washington on August 24, 2010 and is a citizen of both the United States and Italy. Beginning in October of 2010, the Petitioner, Respondent, and SAPH all lived together in Italy.

**MEMORANDUM DECISION AND ORDER- 1**

In July of 2015, the Petitioner agreed to the Respondent traveling with SAPH to the United States but claims the Respondent was to return SAPH to Italy in August of 2015. (Dkt. 1 at ¶ 8.) The Respondent has not returned SAPH to Italy. Petitioner claims SAPH has been wrongfully retained in the United States since August of 2015 and is currently in the State of Idaho. (Dkt. 3-3, Dec. Pennacchia.) Petitioner claims he has custody rights stemming from a May 30, 2014 decision of the Common Court of Rome in Italy. (Dkt. 3-3, Dec. Pennacchia, Ex. C-4.). Petitioner maintains he was exercising his custody rights as SAPH's father at the time of SAPH's wrongful retention. (Dkt. 3-3, Dec. Pennacchia.)

In November of 2015, Petitioner requested SAPH's return through a Hague Convention Application filed with the Central Authority in Italy which was forwarded to the United States Central Authority. (Dkt. 3-4, Ex. D.) On December 15, 2015, the United States Central Authority sent a voluntary return letter to the Respondent to which the Respondent's Italian attorney responded. (Dkt. 3-5, Ex. E) (Dkt. 3-6, Ex. F.) Thereafter, on February 24, 2016, an attorney in Boise, Idaho representing the Petitioner sent a written letter to the Respondent advising that Petitioner would initiate proceedings under the Hague Convention unless Respondent provided assurance that SAPH would be voluntarily returned to Italy. (Dkt. 3-7, Ex. G.) The Respondent replied to that letter by email on March 3, 2016. (Dkt. 3-8, Ex. H.) Respondent and SAPH remain located in Boise, Idaho.

Petitioner initiated this proceeding on April 26, 2016 by filing a Verified Petition for return of child and for provisional relief pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 ("the Convention")

**MEMORANDUM DECISION AND ORDER- 2**

and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. (Dkt. 1, 3.) Both countries at issue in this matter, Italy and the United States, are signatory nations to the Convention. The Petition requested a Temporary Restraining Order ("TRO"), expedited Preliminary Injunction, and return of SAPH to Italy. (Dkt. 1, 3.) The Court denied the TRO and set an evidentiary hearing on the merits of the Petition. (Dkt. 5, 11, 12.) On the June 29, 2016, the Court held the evidentiary hearing. (Dkt. 12, 28, 29.) The parties have filed their briefing on the Petition and the matter is ripe for the Court's consideration.

## DISCUSSION

**1.     The Convention**

The Convention is a multilateral international treaty on parental kidnaping which provides a civil legal mechanism to parents seeking the return of, or access to, their child. The Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes [and] ... seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State [.]" *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (internal quotation marks omitted). The Convention seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as secure protection for rights of access." *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009) (quoting Hague Convention, pmbl., 19 I.L.M. at 1501) (internal quotations omitted). The objects of the Hague Convention are: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and (2) "to ensure that

**MEMORANDUM DECISION AND ORDER- 3**

rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, art. 1; *see also* 22 U.S.C. § 9001(a). The Convention applies where a child has been removed or retained away from his or her habitual residence in breach of the custody rights that the petitioner was exercising at the time of the wrongful removal or wrongful retention. *See* 22 U.S.C. § 9003(e); Hague Convention, art. 3. "The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must order the return of the child forthwith, unless certain exceptions apply." *Abbott*, 560 U.S. at 9 (citation and internal quotation marks omitted). This Court's role in this proceeding is limited to determining the rights under the Convention, not the merits of the underlying custody dispute between the parties. *See Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001) (citing Elisa Pérez-Vera, Explanatory Report ¶¶ 13, 16, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982)); 22 U.S.C. § 9001(b)(4).

**2.     The Petition**

Petitioner argues SAPH's retention in the United States since August of 2015 is wrongful and he seeks SAPH's return to Italy arguing that Italy is SAPH's habitual residence and the nation that should hear the underlying custody claim between the parties. (Dkt. 1, 3.) Respondent counters that the Petition should be denied because SAPH's habitual residence is the United States and, therefore, there has been no wrongful removal or retention in the United States. Respondent also raises several affirmative defenses including that the

**MEMORANDUM DECISION AND ORDER- 4**

Petitioner consented/acquiesced to the removal and/or retention of the Child to and in the United States, granting the petition would expose the child to grave risk of psychological harm and/or place the child in an intolerable situation, and the child is of sufficient age and maturity that her opinion should be considered. (Dkt. 13 at 8, ¶¶ A-L.)

In determining whether the removal or retention of a child is "wrongful" under the Convention, the Court must answer a series of four questions: (1) when did the removal or retention at issue take place (2) immediately prior to the removal or retention, in which state was the child habitually resident (3) did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence (4) was the petitioner exercising those rights at the time of the removal or retention. *Mozes*, 239 F.3d at 1070.

The Petitioner bears the burden of proving by a preponderance of the evidence that the Child in question has been wrongfully removed from or retained outside the nation of her habitual residence. *See* 22 U.S.C. § 9003(e)(1)(A); Hague Convention, arts. 3 and 4. If Petitioner establishes that the removal or retention was "wrongful," the Child must be returned unless the Respondent can establish one or more of four defenses: 1) the ICARA proceedings were not commenced within one year of the Child's abduction; 2) the Petitioner was not actually exercising custody rights at the time of the removal or retention; 3) there is a grave risk that return would expose the Child to "physical or psychological harm" or otherwise place the Child in an "intolerable situation"; or 4) return of the Child "would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms." *Blondin v. Dubois*, 189 F.3d 240, 245 (2nd Cir. 1999); Hague

**MEMORANDUM DECISION AND ORDER- 5**

Convention, arts. 12, 13 and 20. The first two defenses can be established by a preponderance of the evidence; the last two must be established by clear and convincing evidence. *Blondin*, 189 F.3d at 245–46; 22 U.S.C. § 9003(e)(2).

This case hinges on the determination of SAPH's habitual residence.[1] "Determination of 'habitual residence' is 'perhaps the most important inquiry under the Convention.'" *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014) (quoting *Asvesta v. Petroutsas*, 580 F.3d 1000, 1017 (9th Cir. 2009)). Habitual residence is a mixed question of law and fact, and courts are instructed to "consider the unique circumstances of each case when inquiring into a child's habitual residence." *Holder v. Holder*, 392 F.3d 1009, 1016 (9th Cir. 2004). The term "habitual residence" was intentionally left undefined in the Convention to avoid formalistic determinations but the ambiguity has caused some confusion as to how the courts should interpret a child's residence. *See id.* at 1015. In the Ninth Circuit, the analytical framework for determining habitual residence is laid out in *Mozes*. There, the Ninth Circuit recognized that the concept of habitual residence is based on the "settled purpose" to live in a particular place. *Mozes*, 239 F.3d at 1074. In making this determination, the Ninth Circuit instructs that the Court look to the intentions of "the person or persons entitled to fix the place of the child's residence." *Id.* at 1076 ("The intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's

---

[1] The parties do not appear to disagree or seriously contest the other *Mozes* questions asking when the removal or retention took place, whether the Petitioner's rights of custody have been breached, and if Petitioner was exercising his rights at the time of the removal or retention. Regardless, because the habitual residence question is the dispositive inquiry in this case, the Court has not discussed the other *Mozes* questions.

**MEMORANDUM DECISION AND ORDER- 6**

residence."). Where, as here, the child at issue has "not yet reached a stage in their development where they are deemed capable of autonomous decisions as to their residence," the appropriate inquiry is the subjective intent of the parents. *Holder*, 392 F.3d at 1016-17. Thus, the Court will "look for the last shared, settled intent of the parents." *Murphy*, 764 F.3d at 1150 (quoting *Valenzuela v. Michel*, 736 F.3d 1173, 1177 (9th Cir. 2013); *see Mozes*, 239 F.3d at 1074. After taking into account the shared, settled intent of the parents, the Court then asks whether there has been sufficient acclimatization of the child in the new country to trump that intent. *Murphy*, 764 F.3d at 1150 (citing *Mozes*, 239 F.3d at 1076-79) (citations omitted).

    **A.**    **Shared, Settled Intent of SAPH's Habitual Residence**

In this case, the parents dispute what their shared intent of SAPH's habitual residence was from the beginning. Both sides argue they intended for SAPH to live in one country or the other, either Italy or the United States, and that SAPH's travel outside of their chosen country was only temporary. The Court has combed through the many emails, letters, and various exchanges between the parties. These communications reveal language and cultural barriers that made communication and understanding between the parties difficult.[2] When the parties entitled to fix the child's residence no longer agree on their intentions, "the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a child has already

---

[2] The parties are not fluent in one another's language. At the hearing, both parties stated they used internet tools and other means to translate the emails and other correspondence received from one another. Many of these emails were long and detailed.

**MEMORANDUM DECISION AND ORDER- 7**

agreed to the child's taking up habitual residence where it is." *Mozes*, 239 F.3d at 1076.

SAPH began her life on August 24, 2010 in Seattle, Washington. (Tr. 92:1-3.) After SAPH's birth, the parties remained in the United States for two months during which time they decided that Ms. Hayes and SAPH would travel with Mr. Pennacchia to his home in Anagni, Italy to try and live as a family. (Dkt. 24-1, Dec. Hayes at ¶ 16.) The parties have presented diverging intentions and understandings concerning this arrangement. Petitioner argues the parties' intention was to move to and live in Italy as a family and, therefore, SAPH's habitual residence is Italy because that is where she has lived from the time she was two months old, attended preschool, and is where the locus of her family and social environment has developed for the majority of her life. (Dkt. 31) (Tr. 28:19-29:3.) Respondent counters that she agreed to live with the Petitioner in Italy during her year of maternity leave but that it was a "trial basis" and a "conditional stay" that could be terminated if the parties' relationship did not work out. (Dkt. 24-1, Dec. Hayes at ¶¶ 16-23) (Tr. 92:18-93:14, 94:22-95:12.)  Respondent maintains that the United States has always been SAPH's habitual residence since her birth and no subsequent circumstances have changed that fact. (Dkt. 32.)

Before traveling to Italy in October of 2010, Ms. Hayes made several arrangements and executed many documents evidencing her intention was that SAPH's habitual residence was the United States. (Tr. 93:20-94:21, 95:13-96:24.) Following SAPH's birth, Ms. Hayes executed a will and opened a college savings plan for SAPH under Section 529 of the Internal Revenue Code. Notably, Ms. Hayes prepared paperwork to appoint guardians for

**MEMORANDUM DECISION AND ORDER- 8**

SAPH in the United States. Ms. Hayes presented the document to Mr. Pennacchia who agreed to and signed the paperwork appointing the United States guardians. (Dkt. 24, Dec. Hayes, Ex. H) (Petitioner's Ex. C.)[3] Ms. Hayes also obtained a United States passport for SAPH, private United States medical insurance, a Social Security account, and listed SAPH as her dependent on her United States taxes.

The Respondent took other actions that demonstrate her own intention was to remain a resident of the United States. Despite the fact that the Respondent traveled internationally extensively and for long periods of time for her work, she consistently maintained a home, vehicle, bank accounts, credit cards, driver's license, and health care all in the United States. In addition, the Respondent paid taxes and voted in the United States and traveled on a United States passport. The Court agrees with Petitioner that these action only establish the Respondent's residence, not SAPH's. While these actions by the Respondent are not determinative of SAPH's habitual residence, the Court does find these actions are indicative of the Respondent's intentions concerning her own permanent residence and, naturally, her intentions as to SAPH's place of habitual residence. It is reasonable to infer the Respondent's

---

[3] With regard to the guardianship document, and certain other paperwork, Mr. Pennacchia testified that he had not been provided Italian translations, Ms. Hayes had prepared and translated the documents for him, and/or he did not know/understand what he was signing. (Tr. 27:19-28:14, 29:11-32:8, 34:2-36:19, 69:21-22, 70:17-18.) While the Court does not find the Petitioner to be wholly untruthful, particularly given the language barrier, the Court does not necessarily find his testimony to be credible. Moreover, the Court finds the Petitioner's denials and explanations concerning these documents are insufficient, to meet his burden in this case. The documents speak for themselves and are consistent with the Respondent's position and evidence that her intention was always for SAPH's habitual residence to be the United States.

**MEMORANDUM DECISION AND ORDER- 9**

intention was for her infant child to be a habitual resident of the same country that she too called home. *See Holder*, 392 F.3d at 1016-17.

In October of 2010, Mr. Pennacchia also took actions evidencing his intention was for SAPH to reside in Italy. For instance, Mr. Pennacchia took out a mortgage to renovate his home in Italy in order to accommodate Ms. Hayes and SAPH living there. (Dkt. 31 at 8) (Petit. Ex. KK.) Mr. Pennacchia testified that his intention was for he, Ms. Hayes, and SAPH to live as a family in Italy. (Tr. 68:21-22.)

Based on the foregoing and having viewed and considered all of the evidence and materials presented, the Court finds the Petitioner has failed to prove, by a preponderance of the evidence, that the parties' intention was for SAPH's habitual residence to be Italy. Instead, the Court finds the evidence proves that SAPH's habitual residence was and is the United States. The evidence and materials in the record establish the definitive and measured steps undertaken by the Respondent ensured that SAPH's habitual residence was the United States before they departed for Italy in October of 2010. The Respondent was certain and credible in her testimony that she consistently and repeatedly told the Petitioner that her intention was for SAPH to be raised in the United States and that their living arrangement in Italy was temporary and conditional. (Tr. 92:18-93:14, 95:13-19.) The Respondent further testified that the Petitioner agreed and understood that the relocating to Italy was conditional in nature and only for a trial period. (Tr. 93:1-14, 94:22-95:2.) In his testimony, the Petitioner disagrees with the Respondent's testimony and generally denies the meaning and accuracy of the Respondent's testimony and documents. (Tr. 163:6-14.)

**MEMORANDUM DECISION AND ORDER- 10**

Having viewed the evidence and testimony first-hand, the Court finds the Petitioner's testimony lacks credibility and evidence to support his position. The Petitioner's initial actions and communications show the Petitioner knew their arrangement living together in Italy was conditional and he generally did not oppose the Respondent traveling with SAPH to the United States. (Petit. Ex. D, E, LL.)[4] In his later correspondence and conduct, beginning in mid to late 2012, and now his testimony in this case, the Petitioner appears to have changed his position. (Resp. Ex. 47, 83, 25.) The evidence of the Petitioner's initial understanding, however, is consistent with the Respondent's testimony and evidence that their living arrangement in Italy was conditional and a "trial period." That the Petitioner later changed his position does not prove or overcome the Respondent's evidence that SAPH's habitual residence at the time she traveled to Italy in October of 2010 was the United States.

As concluded above, the Court finds the Respondent's testimony was credible and corroborated by other witnesses. The evidence presented by Respondent showing the steps she took to establish SAPH's habitual residence in the United States was substantial and significant. The Court finds the evidence shows the settled intention was for SAPH's habitual

---

[4] Petitioner's September 23, 2012 email to the Respondent states, in part:
We will sign the embassy letter when you go away. I repeat herein that this letter has legal value as a written document. **I, DANILO PENNACCHIA, hereby agree to your request to relocate yourself and [SAPH] to America, as I am aware that you are uncomfortable living in a place where you do not feel at home and are far away from your family. I am aware that you will do your best for our daughter, bearing in mind that I am [SAPH's] one and only father and that, by consenting to your departure, I do not renounce any of my rights as a father.**

(Petit. Ex. LL and Resp. Ex. 15 at Hayes_000046, ¶ 2) (emphasis in original). The Court notes that the Petitioner denies having signed any embassy letter. (Tr. 33:13-36:19.) The Court makes no determination here that Petitioner consented but, instead, finds this language from his email is indicative of Petitioner's understanding and position concerning the parties' arrangement to live in Italy.

**MEMORANDUM DECISION AND ORDER- 11**

residence to be the United States and SAPH's initial translocation from her habitual residence in the United States to Italy was intended to be for a limited, trial period. *See Mozes*, 239 F.3d at 1077. The Court next considers whether there was a sufficient acclimatization to have changed that intent and for SAPH's habitual residence to have become Italy. *Murphy*, 764 F.3d at 1150.

### B.     Acclimatization

In order to acquire a new habitual residence, there must be a settled intention to abandon the one left behind, an actual change in geography, and a passage of an appreciable period of time. *Holder*, 392 F.3d at 1015 (citing *Mozes*, 239 F.3d at 1071-75). A child's life may "become so firmly embedded" in a new country such that the child has acclimatized and formed a new habitual residence. *Mozes*, 239 F.3d at 1078. In cases where there is no shared, "settled intention," a country may be deemed a child's habitual residence if unequivocal and objective facts prove the child has acclimatized to the new country to a degree that the Court could "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'"*Id.* at 1081. Acclimatization, absent a settled parental intent, should only be inferred where "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *Id.*

While little testimony or evidence was offered concerning the parties' first year in Italy, both parties testified that their relationship was not destined to succeed. (Tr. 32:19-21,

**MEMORANDUM DECISION AND ORDER- 12**

97:3-8.) As a result, the Respondent and SAPH began traveling to the United States more and more frequently. (Tr. 97:3-8.)[5] Towards the end of 2011, the Respondent's maternity leave was at an end and, in 2012, she moved out of the Petitioner's home in Anagni, Italy to an apartment in Rome, Italy to begin working for a company that was based there. (Tr. 99:6-100:5.) The parties arranged there own visitation schedule for SAPH now that they lived apart and in different cities.

From 2012 to 2015, SAPH was enrolled in a preschool in Rome, Italy. (Petit. Ex. J, K, L.) The school, La Maisonnette, is a trilingual international school where SAPH was known as the "American girl." (Resp. Ex. 66 at ¶ 24) (Tr. 107:4-108:24) (Tr. 152:3-9.) Ms. Hayes testified that she hired a nanny from the United States to watch SAPH in Italy so that SAPH would be exposed to another American-English speaking person while they were in Italy. (Tr. 98:21-99:5.) Ms. Hayes testified that she took these steps to prepare SAPH for her planned return to "grow up in the school system in the United States." (Tr. 94: 3-4.)

The Respondent called Judy Mansour and Anja Lesa to testify at the hearing. (Tr. 76:2-11, 77:13, 78:8-12) (Tr. 149:21-161:25.) Ms. Mansour is one of SAPH's United States guardians and Ms. Lesa's son was a classmate of SAPH's at La Maisonnette from 2011 to 2015 who also spent time with the Respondent and SAPH outside of school. Both witnesses

---

[5] That Ms. Hayes sometimes referred to her trips from Italy to the United States as "holidays" and "vacations" does not overcome her calculated efforts, which Mr. Pennacchia was aware of, to maintain the United States as her own and SAPH's residence. (Petit. Ex. SS at 121.) In particular, Ms. Hayes' insistence that SAPH be born in the United States, receive regular pediatrician check-ups in the United States, and travel on her United States passport – with the exception of when her United States passport was stolen. (Dkt. 24-1, Dec. Hayes.)

**MEMORANDUM DECISION AND ORDER- 13**

confirmed the Respondent had expressed her intention to return with SAPH to the United States and that the Respondent had no intention of raising SAPH in Italy.

Petitioner has offered as evidence SAPH's Italian certificate of residence, Italian citizenship, Italian birth certificate, and Italian healthcare certificates. (Petit. Ex. A-B) (Tr. 25:1-26:24, 146:16-22.) These documents are reflective of the fact that SAPH was residing in Italy at that time and is a citizen of Italy. Those facts are not in dispute. These documents do not, however, evidence a change in SAPH's habitual residence from the United States.[6]

As further evidence to support his position, Petitioner relies on the custody proceedings in Italy. In particular, the Petitioner argues that the Respondent initiated those proceedings and has agreed that the Italian court has jurisdiction in the custody matters is proof of SAPH's habitual residence in Italy. (Tr. 136:21-139:25.) Moreover, Petitioner notes the Italian court's rulings determined SAPH's habitual residence to be Italy.[7] Respondent disputes these arguments pointing out that she initiated the Italian custody proceedings only after SAPH's United States passport was stolen and only for the purpose of securing a new passport for SAPH.

---

[6] For the same reasons, the Court also finds these documents do not establish SAPH's initial habitual residence was Italy.

[7] To the extent the Petitioner argues the Italian custody proceedings, order, and findings are evidence of the settled intention as to SAPH's habitual residence from the time of her birth, the Court disagrees. The Italian proceedings were initiated well after SAPH's birth and the settled intention for SAPH's habitual residence to be the United States had been made. For these reasons, this evidence is applicable here only as to the acclimatization issue.

**MEMORANDUM DECISION AND ORDER- 14**

Towards the end of 2012, the Respondent told the Petitioner that she intended to relocate herself and SAPH to the United States. (Tr. 112:5-16.) Shortly thereafter, the Respondent and SAPH's United States passports were stolen.[8] When Respondent sought to have SAPH's United States passport reissued, the Petitioner declined to consent. (Resp. Ex. 24.) As a result, the Respondent applied to the Italian court to get permission for issuance of a passport for SAPH which further necessitated seeking a custody determination from the Italian court. (Tr. 116: 22-25.) The parties then began litigating the custody proceeding in Italy. In July of 2013, the Italian court issued a temporary, conditional Italian passport for SAPH and the United States Embassy, in turn, also issued SAPH a limited, temporary passport. The Respondent and SAPH traveled to the United States in August of 2013. They returned to Italy approximately six weeks later because the temporary passports were going to expire. Thereafter, the parties continued to litigate the custody proceedings in Italy.

On June 12, 2014, the Court of Rome issued its ruling rejecting the Respondent's request to move SAPH to the United States and ordering shared custody to both parents. (Petit. Ex. N, O, P) (Resp. Ex. 28.) The Court of Rome placed SAPH with the Respondent in Rome and entered a visitation schedule for Petitioner. Notably, the Court of Rome's decision states in several places that SAPH's habitual residence is Italy. Those statements are made in relation to the Italian court's determination that it had jurisdiction over the custody

---

[8] The Respondent alleges the Petitioner had some involvement in the passports being stolen. (Dkt. 32 at 8.) The Court has not attributed any weight to this argument in making its ruling in this case. That is a collateral matter for a different tribunal to resolve.

**MEMORANDUM DECISION AND ORDER- 15**

proceeding under Articles 1 and 2 of the 1961 Hague Convention and Italian law. The Respondent has filed an appeal of the Court of Rome's order that is pending. (Petit. Ex. Q.)

This Court has reviewed the Court of Rome's ruling in arriving at its decision in this case and taken particular note of the context and circumstances surrounding those proceedings. Having done so, the Court finds that the Italian custody proceedings do not establish SAPH's habitual residence is in Italy under the 1980 Hague Convention. The Italian custody proceedings were not brought under the same 1980 Hague Convention as the Petition in this case and, therefore, they are not directly binding on this Court in this proceeding.[9] The fact that the Italian courts had jurisdiction over the custody proceedings before it and/or that Ms. Hayes recognized that jurisdiction is not determinative of the question presented in this case – SAPH's habitual residence under the 1980 Convention. Further, the fact that the custody proceeding in Italy is ongoing does not establish SAPH's habitual residence. *See Holder*, 305 F.3d at 865 (state custody proceeding determination is afforded preclusive effect in a subsequent Hague Convention claim only if the state court actually adjudicated a Hague Convention claim); *Mozes*, 239 F.3d at 1085 n. 55; *Barzilay v. Barzilay*, 600 F.3d 912, 920-21 (8th Cir. 2010) ("federal courts adjudicating Hague Convention petitions must accord full faith and credit only to the judgments of those state or federal courts that actually adjudicated

---

[9] The October 5, 1961 Hague Convention is a different treaty concerning the powers of authorities and the law applicable to the protection of minors. *See* Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention (1982), at 436 ¶ 38 (stating the 1980 Hague Convention is "autonomous" and "independent" of the 1961 Hague Convention). The United States is not a party to the 1961 Hague Convention. The 1980 Hague Convention, applicable in this proceeding and to which the United States is a party, is designed to protect children from the wrongful removal or retention of a child from its habitual residence. While both treaties use the term "habitual residence," neither defines it.

**MEMORANDUM DECISION AND ORDER- 16**

a Hague Convention claim in accordance with the dictates of the Convention."). The Court finds the circumstances under which the Respondent pursued the custody dispute in Italy dispels the inference by Petitioner that the Respondent's intention or belief was that SAPH's habitual residence was Italy. The custody proceedings were initiated by the Respondent out of necessity and for the purpose of obtaining SAPH's passport after it had been stolen.

The Court further finds the evidence does not show that SAPH has acclimated to Italy such that her habitual residence has changed from the United States. While SAPH lived in Italy for several years, the Petitioner offered only very limited evidence of SAPH's Italian influences or her acclimatization. Petitioner showed photographs of SAPH's room at his home in Anagni, Italy. (Petit. Ex. KK.) Petitioner had demanded that SAPH's passport reflect her full name, including her Italian last name. (Tr. 30:6-19.) Petitioner testified that SAPH attended school in Rome, Italy for three years and her teachers and principal told him that SAPH was a "very smiley girl," "happy to be with her father," and she invited her friends to come to his house in Anagni, Italy. (Tr. 38:6-39:6, 44:1-6, 57:14-58:9.) Petitioner testified that while SAPH was in Rome he would pick her up and take her to Anagni, Italy for his visitations where there was "nature" and she was given lots of love and affection. (Tr. 58:9, 59:7-10.) These facts and evidence reveal SAPH has a loving father who was involved in her life, was exercising his custody rights, and spent time with her while she was in Italy. Mr. Pennacchia has not, however, shown that SAPH acclimated to Italy such that her habitual residence had changed from the United States.

**MEMORANDUM DECISION AND ORDER- 17**

The Respondent, on the other hand, has come forward with compelling, credible evidence that SAPH's habitual residence was, and remained, the United States during their time in Italy. While in Italy, SAPH attended a trilingual school where she was known as the "American Girl," celebrated the Fourth of July and, for nine months, had an American-English speaking nanny. SAPH traveled to the United States frequently and for extended stays with her American family and friends. These strong cultural ties to the United States demonstrate that despite her residing in Italy for large portions of the year, she retained her original habitual residence in the United States.

Based on the foregoing, the Court concludes SAPH's habitual residence is the United States and, therefore, the Petition is denied.[10] In reaching this conclusion, the Court is mindful that its role in this matter is limited to determining whether, by a preponderance of the evidence, removal or retention of the child is wrongful under the Convention, and if so, to order return of the minor child to the country of habitual residence. 22 U.S.C. § 9001(b)(4); *see also Holder*, 392 F.3d at 1013 ("The Convention's focus is [] whether a child should be returned to a country for custody proceedings and not what the outcome of those proceedings should be."). Custody determinations are not before this Court and the Court has not considered any arguments or evidence concerning custody, what may or may not be in the best interests of SAPH, and/or parental suitability.

---

[10] Having found SAPH's habitual residence is the United States, the Court need not discuss the Respondent's affirmative defenses.

**MEMORANDUM DECISION AND ORDER- 18**

Furthermore, the Court notes the Convention's primary purpose is to deter parents from moving children across international boarders in order to gain the upper hand in custody disputes. *See Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). The Court finds the Respondent's actions in this case do not run afoul of that purpose despite her contention that she has not yet traveled back to Italy, in part, because of the alleged abuse and coercive actions by Petitioner. (Dkt. 32 at 11-12.) The Respondent's refusal to travel to Italy after August of 2015 and her reasoning for not doing so have not factored into the Court's ruling as it is not relevant to the determination of SAPH's habitual residence. The determination here turns on the facts and evidence of events preceding the Respondent's decision to not travel back to Italy in August of 2015. Additionally, the Court does not find this to be a case where the Respondent has sought to influence the outcome of custody proceedings by unilaterally changing the circumstances, i.e., removing or retaining SAPH from her habitual residence. As concluded above, the United States has been and remains SAPH's habitual residence since her birth. For these reasons, the Petition is denied.

## ORDER

THEREFORE IT IS HEREBY ORDERED that the Verified Petition for Return of Child (Dkt. 1) is **DENIED**.

DATED: **July 28, 2016**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM DECISION AND ORDER- 19**